United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 3, 2006**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 05-10637

HENRY THOMAS HIGH,

Plaintiff – Appellant,

versus

E-SYSTEMS INC., LONG TERM
DISABILITY INCOME AND DEATH
BENEFIT PLAN, RAYTHEON
EMPLOYEES DISABILITY TRUST
AND METROPOLITAN LIFE
INSURANCE COMPANY,

Defendants – Appellees.

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH and STEWART, Circuit Judges, and CRANE, District Judge.[*]

CARL E. STEWART, Circuit Judge:

Plaintiff-Appellant Henry Thomas High ("High") appeals the district court's grant of summary judgment. High, an employee of E-Systems and a participant in the E-Systems Benefit Plan, later managed by MetLife, initiated this proceeding in the district court, alleging that when MetLife became the plan's claims administrator in 1998, it improperly began reducing his monthly plan disability payments by the amount of Veterans Administration ("VA") benefits he was receiving. The district

---

[*] District Judge of the of Southern District of Texas, sitting by designation.

court disagreed, granting summary judgment in favor of E-Systems after finding that MetLife did not abuse its discretion or act arbitrarily or capriciously in modifying High's disability benefits payments. Because the record suggests that (1) the district court did not err in granting summary judgment to E-Systems and determining that MetLife did not abuse its discretion when it offset High's monthly disability benefits by his VA benefits; and (2) High does not meet the requisite elements to support this court finding that the doctrine of ERISA-estoppel or waiver applies, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

This case involves an employee welfare benefit plan governed by ERISA. High was hired by E-Systems in September of 1982. He had been receiving monthly VA benefits prior to being hired and he continued to receive these VA benefits throughout his employment; this fact was fully disclosed to E-Systems. Through his employer, High elected to contribute to the E-Systems Plan in case he were no longer able to work due to a permanent disability.

On July 1, 1998, the E-Systems Plan, merged into the Raytheon Company Long Term Disability Benefits Plan ("Raytheon Plan"); Raytheon Company is the plan administrator, but the E-Systems Plan still governs the terms of High's monthly benefits under the Raytheon Plan. All benefits payable under the E-Systems Plan are funded exclusively by employee contributions. MetLife provides claims administrative services to the plans and the plans grant MetLife broad authority to construe plan terms.

In 1992, High became unable to work and began receiving long-term disability payments under the E-Systems Plan without offset for his VA benefits. These monthly disability payments under the E-Systems Plan continued until 1998 when MetLife became the new claims administrator. At that time, after an extensive investigation, MetLife notified High that his benefits would be offset

2

by his VA benefits, determining that even though the policy did not specifically include VA benefits as a source for offset, it was suggested by the language of the E-Systems Plan. High then appealed this decision to Raytheon Company; it agreed that the VA benefits should be offset. High appealed again, and again his request to reinstate the original amount of his disability benefits was denied. Accordingly, High's disability payments were reduced from just over $1,200 per month to $50 per month, beginning in September of 1998.

As a result, High filed suit in Texas state court on September 27, 2004, complaining that when MetLife became the plan's claims administrator in 1998, it improperly began reducing his monthly plan disability payments by the amount of the monthly VA benefits he was receiving. He sought past and future benefits. The case was removed to federal court because it involves an ERISA plan and is, therefore, governed by federal law.

On March 27, 2004, E-Systems moved for summary judgment asserting that the plan administrator was granted discretion to make benefit decisions under the plans and that the decision to reduce High's payments per his VA benefits was not arbitrary or capricious. High responded that the adverse decision was an abuse of discretion because it contradicted the plain language of the E-Systems Plan. Agreeing with E-Systems, the court granted its motion for summary judgment holding that the claims administrator had discretion to make an adverse benefit determination. It entered judgment against High on February 8, 2005. Thereafter, High filed a motion to alter or amend the judgment; the court denied his motion and High appealed.

DISCUSSION

3

A.      Whether the District Court Erred in Granting Summary Judgment

1. *Standard of Review*

The standard of review for a district court's grant of summary judgment is de novo. *Facility Ins. Corp. v. Employers Ins. of Wausau*, 357 F.3d 508, 512 (5th Cir. 2004) (citing *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003)). Summary judgment is only appropriate if the evidence shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(c). When, as here, the language of the plan grants discretion to an administrator to interpret the plan and determine eligibility for benefits, a court will reverse an administrator's decision only for abuse of discretion. *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999). In the summary judgment context, to avoid reversal, the ERISA administrator's decision must be supported by substantial evidence in the administrative record. *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 273 (5th Cir. 2004). Substantial evidence is that which a reasonable mind might accept as sufficient to support a conclusion. *Id.*

2. *Analysis*

One of the underlying principles of ERISA is to ensure that employee benefits are given as promised and as expected. *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Therefore, ERISA has specific provisions regarding decisions that may affect these expectations. For example, an adverse benefit determination is "any of the following: a denial, reduction, or termination of, or a failure to provide or make payment (in whole or part) for, a benefit." 29 C.F.R. 2560.503-1(m)(4) (2004). "In the case of a claim for disability benefits, the plan administrator shall notify the claimant

4

. . . of the plan's adverse benefit determination within a reasonable period of time, but not later than 45 days after receipt of the claim by the plan." 29 C.F.R. 2560.503-1 (f)(3) (2006).[2]

On the other hand, even though Congress strictly guards ERISA plans, where an ERISA plan gives an administrator discretionary authority to determine eligibility for benefits and to construe terms, courts may not reverse the administrator's benefits determinations absent an abuse of discretion. *Meditrust*, 168 F.3d at 213. The E-Systems Plan provides discretionary authority to the plan administrator, as does the subsequent Raytheon Plan. Accordingly, we may apply a two-step analysis to determine whether the administrator in this case abused its discretion, first determining whether the administrator's decision was legally sound and, if it is not, determining whether the decision was an abuse of discretion in any event. *Duhon v. Texaco*, 15 F.3d 1302, 1307 n.3 (5th Cir. 1994).[3] This court, however, is not confined to this test; we may skip the first step if we can

---

[2]High points out that a period exceeding 90 days after receipt of the claim by the plan was considered unreasonable by the regulations in effect in 1992, when High began receiving his disability benefits. 29 C.F.R. 2560.503-1 (e)(3) (1992).

[3]This test is referred to as the *Wildbur* Test from *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631 (5th Cir. 1992). *Wildbur* detailed the following test:

> First, a court must determine the legally correct interpretation of the plan. If the administrator did not give the plan the legally correct interpretation, the court must then determine whether the administrator's decision was an abuse of discretion . . . . In answering the first question, i.e., whether the administrator's interpretation of the plan was legally correct, a court must consider:
> (1) whether the administrator has given the plan a uniform construction,
> (2) whether the interpretation is consistent with a fair reading of the plan, and
> (3) any unanticipated costs resulting from different interpretations of the plan.
> If a court concludes that the administrator's interpretation is incorrect, the court must then determine whether the administrator abused his discretion. Three factors are important in this analysis:

determine the decision was not an abuse of discretion. *Id.*; *see MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472, 481 (5th Cir. 2003); *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 602-03 (5th Cir. 2003) (concluding that an ERISA administrator's determination was not an abuse of discretion and affirming judgment on that basis without considering whether the administrator's determination was legally correct). Accordingly, in assessing whether MetLife abused its discretion in applying the offset, our analysis bypasses whether MetLife's determination was legally correct, as the record reflects that it has not abused its discretion.

High asserts that the six year gap during which he received both VA benefits and benefits under the E-Systems plan was an unreasonable amount of time for E-Systems to delay adjusting his entitlements. The time lapse that occurred in this case, however, is only one variable in the equation that we consider; thus the regulations, referred to by High and cited above, delineating a "reasonable time" are not instructive. This situation is not one where MetLife knew about the improper disability benefits and then, six years later, applied an offset provision; this is a situation where once MetLife took over as claims administrator, it reviewed the policy provisions and disability payments it would be making, immediately found a discrepancy in High's disability payments, conducted a thorough investigation, contacted the former plan administrator for an opinion, considered whether other participants in the E-Systems Plan had their benefits offset under the provision, allowed High to appeal (twice) its decision to offset VA benefits, and then made an ultimate determination to (a) offset

---

> (1) the internal consistency of the plan under the administrator's interpretation,
> (2) any relevant regulations formulated by the appropriate administrative agencies, and
> (3) the factual background of the determination and any inferences of lack of good faith.

*Id.* at 637-38.

6

VA benefits and (b) not attempt to collect retroactively the benefits inadvertently paid from 1992-1998. We hold that this scenario constitutes careful deliberation on MetLife and E-Systems's part and does not evidence arbitrary or capricious decision-making. The record reflects that there is a "rational connection between the known facts and the [ultimate] decision." *Meditrust*, 168 F.3d at 215. Thus, MetLife's determination was reasonable.

On appeal, High cites to *Barnett v. Aetna Life Insurance Co.*, 723 S.W.2d 663, 667 (Tex. 1987), for the proposition that VA benefits are "unique in character." In that case, the Texas Supreme Court found, "[b]enefits under the VA appear to be unique in character and scope, certainly important enough to warrant specific mention in an insurance policy if they are sought to be offset." At first glance, High's argument is quite compelling; however, a closer look reveals that his argument is misplaced. First, *Barnett* applies Texas insurance law, which is preempted by ERISA. *See Thibodeaux v. Cont'l Cas. Ins. Co.*, 138 F.3d 593, 596 (5th Cir. 1998) ("We, like other circuits that have addressed this issue, agree that ERISA preempts state law governing insurance policy interpretation."). Second, *Barnett* involves an insurance policy and not a self-funded ERISA plan, as in this case. Third, the language referred to by High in *Barnett* did not include an all-encompassing provision, as in the E-Systems Plan, providing for a reduction "*by other income benefits* to which such Employee may be entitled, and which are payable on or after the commencement of the disability for which benefits are payable," including "*other income benefits*: (a) Disability benefits payable under the federal Social Security Act (including benefits for dependents); (b) Earnings continuation from any Employer; (c) benefits payable under *any other group disability plan*; and (d) benefits payable under any workmen's compensation or similar law." The E-System Plan also provides that if an insured becomes totally disabled, his monthly benefits payments "will be reduced by any primary and

dependent benefits paid or payable under social security, worker's compensation and the *provisions of the E-Systems Retirement Plans*." Therefore, High's reliance on *Barnett* is misplaced.

Furthermore, High's assertion that the language of the plans is ambiguous and, therefore, the rule of *contra proferentum* should apply is without merit. This court has explained that eligibility for benefits under an ERISA plan is first governed by the plain meaning of the language of the contract. *Threadgill v. Prudential Sec. Group, Inc.*, 145 F.3d 286, 292 (5th Cir. 1998). Only when the plan terms remain ambiguous after applying ordinary principles of contract interpretation does this court apply the rule of *contra proferentum* and construe the terms strictly in favor of the insured. *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir.1997). High's case, however, does not warrant the application of this rule; the language of neither the E-Systems Plan nor the Raytheon Plan is ambiguous and, as E-Systems suggests, by giving MetLife complete discretion to interpret the plans, if there had been an ambiguity, MetLife was empowered to resolve it, exercising "interpretive discretion." *MacLachlan*, 350 F.3d at 482. Therefore, because the plans clearly state that discretion is given to the plan administrator to carry out and interpret the plan, we affirm the district court's grant of summary judgment as to this issue.

B.      Whether ERISA-Estoppel or Waiver Applies

1. *Standard of Review*

"Because the application of ERISA-estoppel is a legal theory rather than an interpretation of the Plan's terms, it should be reviewed de novo." *Mello v. Sara Lee Corp.*, 431 F.3d 440, 444 (5th Cir. 2005); *see Rhorer v. Raytheon Eng'rs & Const'rs, Inc.*, 181 F.3d 634, 639 (5th Cir.1999).


2. *Analysis*

8

In late 2005, this court in *Mello* joined "other circuits in explicitly adopting ERISA-estoppel as a cognizable theory. To establish an ERISA-estoppel claim, the plaintiff must establish: (1) a material misrepresentation; (2) reasonable and detrimental reliance upon the representation; and (3) extraordinary circumstances." *Mello*, 431 F.3d at 444-45. In *Mello*, a disagreement arose between Frank Mello and his employer, Sara Lee, who acquired Mello's original employer, Bil Mar Foods, over whether Mello's pension benefits should be calculated using a hire date of September 17, 1984, (the date Mello began working for Bil Mar Foods) or October 31, 1994 (the date Mello and other Bil Mar Foods executives were allowed to enter the Sara Lee pension plan.) If the former date was used, Mello would receive $6,500 each month in pension benefits, but if the latter date was used, he would only receive $950 a month. Bil Mar Foods maintained its own retirement plan and Mello participated in it from 1984 to 1994; therefore, he remained entitled to receive benefits from that plan. Like the E-Systems Plan, Sara Lee was given the discretion to enforce its plan.

In introducing the doctrine of ERISA-estoppel to this circuit, the panel analyzed the elements of Mello's estoppel claim. The panel held that Sara Lee had made a material representation to Mello by providing benefits statements misrepresenting the details of the benefit payments he was to receive. The panel stated that a "misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision." Furthermore, the panel explained that ERISA-estoppel requires Mello to show "reliance upon the representations made by Sara Lee. The reliance must be both reasonable and detrimental." *Id*. at 445. Ultimately, the panel stated that though Mello's reliance may have been detrimental, it was not reasonable, as Mello relied on the benefits statements and an employee's assertions rather than the unambiguous provisions provided in the plan. *Id*. Accordingly, the court held that the doctrine of ERISA-estoppel was

9

inapplicable to the facts of Mello's case; the panel did not even reach the "extraordinary circumstances" element of the test.

Assuming arguendo that the actual disability benefits paid by E-Systems and received by High at a certain consistent amount for a six year period is sufficient to meet the material misrepresentation element, taking into account that his benefits were subsequently significantly reduced,  we move to the second prong of the test: whether High's reliance is both detrimental and reasonable.  High argues and we agree that he did rely to his detriment on these payments; he was permanently disabled and depended on these disability payments as a replacement for the salary that he once drew.  High even asserts that he used the pre-1998 monthly income total to secure certain loans.  Therefore, we find that High did rely on receiving a check for $1,200 rather than a check for $50, to his detriment.  The question before us, however, is a conjunctive one; High's reliance must also be reasonable.

In answering this question, the Sixth Circuit in *Sprague v. GMC*, 133 F.3d 388, 404 (6th Cir.1998), reasoned that a "party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party."  The court held that allowing "estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves. That would not be consistent with ERISA."  *Id*.  Additionally, in *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation*, 58 F.3d 896, 902 (3d Cir.1995), the Third Circuit emphasized that a basic principle of ERISA is that a plan cannot be modified or superceded by extrinsic evidence.  In that case, a company engaged in a "systematic campaign of confusion" that led employees to believe that their benefits continued for life. *Id*. at 907 n. 20.  The court agreed that many of these employees may have relied on these bald assertions to their detriment; however, because the actual plan included "unambiguous reservation

10

of rights clauses," the court determined that the employees' estoppel claims were precluded because

relying to their detriment that they would receive lifetime benefits, which conflicted with the plain

language of the plan, was unreasonable.  The court ultimately held:

> While our decisions have not required an express finding of plan ambiguity
> as an element for establishing an estoppel claim, we have required that
> reliance be reasonable. Because our decisions require that any detrimental
> reliance on plan language also be "reasonable," our finding that the [terms
> of the Plan] are unambiguous undercuts the reasonableness of any
> detrimental reliance by the retirees. Accordingly, we hold that the district
> court did not err in concluding, on summary judgment, that the retirees'
> estoppel claim failed as a matter of law.

*Id*. at 908.

Therefore, because we have determined that the language of the E-Systems Plan granting

complete discretion to the plan administrator to offset group disability plan and other income benefits

is not ambiguous, we hold that the doctrine of ERISA-estoppel does not apply in this case.  High

cannot reasonably rely on the actual receipt of disability benefits when the policy itself details that

such reliance is unreasonable.[4]

---

[4]Even if we had determined that High's reliance was detrimental *and* reasonable, he still would likely fail in his effort to satisfy the ERISA-estoppel test, as extraordinary circumstances do not exist. In *Mello*, Mello asserted that written benefit statements and oral statements by Sara Lee executives repeatedly assuring Mello over a six-year period that he was entitled to a monthly amount that was much greater than he was actually paid constituted extraordinary circumstances. *Mello*, 431 at 443. This court, however, did not explain in *Mello* or other case law what constitutes extraordinary circumstances in an ERISA-estoppel analysis.  The Third Circuit in *Curcio v. John Hancock Mutual Life Insurance Co.*, 33 F.3d 226 (3rd Cir. 1994), however, discussed it in depth, providing the following case illustrations to better demonstrate the meaning of this element of ERISA estoppel:

> We have not specifically defined this term, rather we rely on caselaw to establish its
> parameters.  In *Rosen v. Hotel and Restaurant Employees and Bartender's Union*,
> 637 F.2d 592 (3d Cir. 1981), we found that extraordinary circumstances existed when
> the trustee of a pension fund advised Rosen that his pension was in jeopardy due to
> his employer's failure to make payments to the fund, allowed Rosen to write out a
> check for the remainder of the employer's debt, and deposited the check.  *Id*. at 598.

In High's final argument, he asserts that the doctrine of waiver applies; he argues that when E-Systems paid the full amount of his benefits without offsetting VA benefits for a six year period, it waived the right to subsequently take those benefits away from him. E-Systems urges that this theory is preempted by ERISA. Even if the doctrine of waiver were to apply to any effort by E-Systems to recover the overpayments, the case law, including that relied upon by High, does not support an application of it here.

Our caselaw defines waiver as "a voluntary or intentional relinquishment of a known right." *Pitts v. Am. Sec. Life Ins. Co.*, 931 F.2d 351 (5th Cir. 1991); *Rhorer*, 181 F.3d at 639 (5th Cir.

---

> We held that the trustee was then estopped from asserting that Rosen's payment did not entitle him to his pension. *Id.* By contrast, in *Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310 (3d Cir. 1991), Gridley, while continually and totally disabled in the hospital, increased his life insurance coverage under a plan that specifically required active, full-time status for such an increase. Although the employer deducted additional amounts from his salary to cover the increase, we found that extraordinary circumstances did not exist when the insurance carrier refused the additional amount. *Id.* at 1319 (citing *Hozier v. Midwest Fasteners Inc.*, 908 F.2d 1155, 1165 n. 10 (3d Cir.1990)) . . . . [In this case,] we have another hospital misrepresenting the type of coverage for which recipients could enroll. Capital Health compounded its error by reassuring Mrs. Curcio that she was covered in the amount of $400,000 after the accidental death of her husband . . . . Although it was not in Capital Health's control, John Hancock contributed to the anguish by first confirming the coverage Mrs. Curcio expected and then disclaiming that such protection would be forthcoming. The roller coaster did not stop there. Capital Health supported Mrs. Curcio's claim to the point of encouraging her to file suit, even offering to pay her legal fees. It retained outside counsel to review the matter and offered [its] services to her without charge . . . . Somewhere along the way Capital Health had a change of heart . . . . These events in our view are demonstrative of extraordinary circumstances.

*Id.* at 237-38. Relying on these examples as guidance, even if we were to find that High's reliance were reasonable, the facts and sequence of events in this case do not reasonably amount to extraordinary circumstances.

12

1999).[5] In this case, however, once MetLife discovered the overpayments, it conducted an investigation and adjusted the benefits payments accordingly; the actions of MetLife cannot be referred to as "waiver" because they cannot be referred to as intentional, as it was not MetLife who initially failed to offset High's VA benefits. Therefore, keeping in mind the fact that MetLife did not even provide claims administration services when High began receiving payments in 1992, we find the doctrine of waiver inapplicable.

CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[5]In *Pitts*, the court found that the insurer waived the condition of coverage used to deny a health insurance claim because it accepted premiums for coverage for five months after learning beyond all doubt that the condition had not been met. 931 F.2d at 357. Likewise, in *Rhorer*, the claim by the beneficiary was that the plan administrator waived a condition for coverage under a group insurance policy because the plan administrator accepted the employees' insurance premiums for several months after he allegedly knew of the failure of the condition for coverage. 181 F.2d at 645. As stated above, this is not the case in this appeal.